**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

United States of America

v.                                      Case No. 20-mj-229-AJ

Ryder Winegar

## ORDER OF DETENTION PENDING TRIAL

Ryder Winegar ("defendant") has been charged with Threats Against Members of Congress, in violation of 18 U.S.C. § 115(a)(1)(B).  An investigating officer's affidavit submitted with the criminal complaint in this case describes a series of phoned-in threats to assault or murder specific Members of Congress, in violation of 18 U.S.C. § 115(a)(1)(B), left on their office voicemail around 1:00 a.m. on December 16, 2020. The government moved to detain the defendant on risk of flight and dangerousness grounds.  The defendant seeks release.

In accordance with 18 U.S.C. § 3142(f)(1)(A), a detention hearing was conducted on January 15 and 28, 2021.  For the reasons explained below, the government's motion for detention is granted.

## Applicability of Section 3142(f)(1)(A)

Section 3142(f) of the Bail Reform Act, 18 U.S.C. §§ 3141-3156, "does not authorize a detention hearing whenever the

government thinks detention would be desirable, but rather limits such hearings" to the circumstances listed in 18 U.S.C. §§ 3142(f)(1) and (f)(2).  United States v. Ploof, 851 F.2d 7, 10 (1st Cir. 1988).  In this case, the government asserted that a detention hearing was warranted under 18 U.S.C. § 3142(f)(1)(A), which provides authority for the government to seek detention where a defendant is charged with a "crime of violence."  Winegar has argued, however, that the charged offense does not qualify as a crime of violence.

The Bail Reform Act defines a "crime of violence," in pertinent part, as "an offense that has as an element of the offense the . . . threatened use of physical force against the person or property of another."  18 U.S.C. § 3156(a)(4)(A). Defendant is charged with violating 18 U.S.C. § 115(a)(1)(B), which makes it a crime to

> threaten[] to assault, kidnap, or murder, a United States official . . . with intent to impede, intimidate, or interfere with such official . . . while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties.

The incidents described in the affidavit filed with the criminal complaint -- specifically, phoned-in threats to kill or assault Members of Congress -- clearly involve the threatened use of force.  To determine if the criminal offense has the threatened use of force as an element, however, the court must consider

whether the statutory elements of the crime categorically involve the threatened use of violent, physical force, without reference to the manner in which this defendant is alleged to have violated the law.  See United States v. Santoro, 359 F. Supp. 3d 122, 127-28 (D. Me. 2019) (discussing the application of the so-called "categorical approach" to determine if 18 U.S.C. § 875(c) is a "crime of violence" under the Bail Reform Act); see also United States v. Taylor, 848 F.3d 476, 491-92 (1st Cir. 2017).

Each of the pertinent elements of the offense at issue in this case necessarily implies the threatened use of physical force.[1]  See United States v. Bates, No. 12-cr-082-01-SM, 2012 WL 2343282, at *1, 2012 U.S. Dist. LEXIS 84489, at *2 (D.N.H. June 18, 2012); see also United States v. Kabbaj, Crim. No. 16-365, 2016 WL 11660082, at *11, 2016 U.S. Dist. LEXIS 125226, at *31 (E.D. Pa. Sept. 12, 2016).  This conclusion is consistent with cases that have found similar threat statutes to be properly categorized as crimes of violence for the purposes of the Bail Reform Act or the U.S. Sentencing Guidelines.  See, e.g.,

---

[1] The court assumes without deciding that the listing of "threat[s] to assault, kidnap, or murder" in Section 115(a) is an indivisible description of the means an offender might employ to commit the crime of threatening a federal official, rather than a divisible list of alternative elements of separate threat offenses.

Santoro, 359 F. Supp. 3d at 127-28 & n.13 (communicating a "threat to injure" another person under 18 U.S.C. § 875(c) necessarily implied the threatened use of violent, physical force); see also United States v. Spangle, 617 F. App'x 764, 765 (9th Cir. 2015) (18 U.S.C. § 876(c), making it a crime to mail a threat to kidnap a person, categorically qualified as "crime of violence" for purposes of the sentencing guidelines, as there was no "realistic probability" that a "threat" to kidnap would not involve a threatened use of physical force).  Accordingly, I find that the charged offense under § 115(a)(1)(B) is properly categorized as a "crime of violence" under the Bail Reform Act and that the detention hearing was authorized under § 3142(f)(1)(A).[2]

## Section 3142(g) Factors

I.   Standard and Burdens of Proof

After the court decides that a detention hearing is warranted, it must determine whether any condition or combination of conditions set forth in § 3142(c) will reasonably assure the appearance of the defendant ("risk of flight") and the safety of any other person and the safety of the community

---

[2] The court need not reach the alternative argument that a detention hearing was warranted under 18 U.S.C. § 3142(f)(2), which provides authority for the government to seek detention where there is "a serious risk that [the defendant] will flee."

("dangerousness").  See 18 U.S.C. § 3142(f); United States v. Patriarca, 948 F.2d 789, 791 (1st Cir. 1991).  In making this determination, the court must consider the following: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the accused, including family ties, past history, financial resources, and employment; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release.  18 U.S.C. § 3142(g).  During the course of a hearing conducted pursuant to 18 U.S.C. § 3142, the government has the burden of persuading the court that no condition or combination of conditions will reasonably assure (1) the defendant's presence at trial, United States v. Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988); or (2) the safety of another or the community.  Patriarca, 948 F.2d at 793.  The government is required to prove risk of flight by a preponderance of the evidence and to establish dangerousness by clear and convincing evidence.  See id. at 792-93.

II.  Findings and Rulings

    In this case, the government argues that the defendant's release poses a risk of flight and danger to the community. After weighing the evidence and information before the court, including the pretrial services reports as well as the parties'

proffers and pleadings, balancing the factors laid out in 18 U.S.C. § 3142(g), and considering the defendant's lack of transparency and candor in his interactions with pretrial services and the court, as well as the inability of his proposed third-party custodian – his wife, Patricia Winegar – to adequately supervise the defendant, the court finds that the government has established that there are no conditions that will reasonably assure the safety of any other person and the community.

### A. **Dangerousness**

#### 1. <u>Nature and circumstances of the offense</u>

The defendant is charged with crimes that involve threats of murder and mayhem targeting Members of Congress. The charging documents allege that he left a series of seven voicemails at the offices of six Members of Congress around 1:00 a.m. on December 16, 2020, using a cell phone number registered in his wife's name. Those voicemails contain threatening language directing the Members of Congress to support a particular cause or else face violence and death. Individualized threats based on personal grievances or perceived injustices may present a danger by inducing fear. The type of threat here presents a graver, broader danger -- the charged use of violent imagery to induce fear and intimidate an elected

6

official into falling in line behind a cause.  See generally
United States v. Capriotti, No. 21 CR 16, 2021 WL 229660, at *4,
2021 U.S. Dist. LEXIS 12223, at *14 (N.D. Ill. Jan. 22, 2021)
(finding that "the making of the threats themselves represent[s]
a harm to the community").  The threats at issue here are a
brazen attempt to influence elected officials through fear, by a
person claiming to be part of a group empowered to assault and
kill to effect political ends.[3]  Such threats seek to undermine
the rule of law and disrupt the proper functioning of our
government.  This factor weighs in favor of detention.

       In addition to the circumstances related to the charged
offense, there is further information before this court
regarding uncharged conduct that favors detention.  Someone
self-identifying as the defendant sent a similarly-worded email
to a member of the New Hampshire legislature on December 14,
2020.  Cf. United States v. Rivera-Sepulveda, No. 19-695 (RAM),
2020 WL 402277, at *2, 2020 U.S. Dist. LEXIS 14692, at *5
(D.P.R. Jan. 24, 2020) ("The Court may consider uncharged
conduct in assessing the degree of danger posed by the
defendant's release." (citing United States v. Rodriguez, 950

---

       [3] The voicemails repeatedly use the word "we" in describing
how the threatened acts of violence will be carried out,
suggesting an association – real or imagined – with a larger
group.  See Doc. No. 1-2.

F.2d 85, 88-89 (2d Cir. 1991)).  Such information taken together
with the charged offenses may manifest either an increasing
level of unrestrained, impulsive, threatening behavior targeting
elected officials at all levels, or a purposeful realignment and
retargeting of threats of political violence over a short period
of time, shifting from a single legislator to multiple Members
of Congress.  Either way, such information shows dangerousness
and favors detention.  See, e.g., United States v. Jeffries, No.
3:10-CR-100, 2010 WL 3619946, at *6, 2010 U.S. Dist. LEXIS
95293, at *16 (E.D. Tenn. Sept. 10, 2010) (considering, as part
of its dangerousness analysis, that the defendant's "threats
appear to be escalating" and ruling in favor of detention).

     Given the circumstances of this case, the defendant's
possession of firearms and other dangerous weapons at the time
the threats were made also weighs in favor of detention.  The
court may consider the defendant's firearms and other weapons,
even if legally possessed, in assessing dangerousness.  See
United States v. Stone, 608 F.3d 939, 953 (6th Cir. 2010)
(defendant's "substantial" cache of weapons and repeated
statements about killing judges and law enforcement officers
supported a dangerousness finding); United States v. Robinson,
No. 5:14-CR-00809-JMC-1, 2014 WL 7338961, at *7, 2014 U.S. Dist.
LEXIS 176529, at *17-18 (D.S.C. Dec. 22, 2014) (court may

consider lawfully possessed firearms in assessing
dangerousness).  Federal officers who executed a search warrant
at defendant's home on December 22, 2020 discovered a
substantial arsenal of weapons and ammunition, including,
specifically, a loaded AR-15 rifle (with light armor-piercing
ammunition), a loaded shotgun, a loaded 9mm pistol, an unloaded
rifle with a scope, several hundreds of rounds of ammunition,
and a body armor vest, with clips and Level IV body armor
plates.  When considered alongside the defendant's violent
threats against Members of Congress, the presence of those items
in his home is relevant to the court's assessment of
dangerousness and weighs in favor of detention.

     2.   <u>Weight of the evidence</u>

The evidence against the defendant includes verbatim
statements of graphic and violent threatening communications,
promising harm or death as retribution for failing to support a
political cause, left on the voicemails of Members of Congress,
with records linking the phone number from which the calls were
made to an account in the name of defendant's wife.  In at least
two voicemails, Winegar identifies himself by name, and in at
least one, he leaves his phone number.  The strength of the
evidence favors detention.

3.   <u>History and characteristics of the defendant</u>

The feasibility of pretrial release and supervision depends
to a large extent on the defendant's transparency, reliability,
and capacity to comply with conditions.  <u>Cf.</u> <u>United States v.
Tortora</u>, <u>922 F.2d 880, 886-87 (1st Cir. 1990)</u> (finding that the
"Achilles' heel" of the conditions of pretrial release set by
the district court in that case "is that virtually all of them
hinge on the defendant's good faith compliance").  Defendant is
a decorated, honorably discharged Navy veteran, with no criminal
record and no reported history of substance abuse, who is the
primary caregiver of two children, ages one and four.  Such
factors can be cited as evidence of trustworthiness and an
ability to carry out directives, favoring release in many cases.
But those factors here are offset and outweighed by this
defendant's pattern of shading the truth and failing to be
entirely forthright with the court and probation.  The court is
not convinced that the defendant is capable of the requisite
transparency and trustworthiness necessary to ensure adequate
supervision or reasonably assure the safety of the community if
he were to be released.

The incidents that raise such concerns for the court
include the defendant's failure to volunteer facts regarding his
previous access to, and his knowledge regarding the fate of,

firearms located in his home at the time he left for Brazil in late December 2020.  When the probation officer who prepared a pretrial services report in this case asked the defendant in January 2021 about the presence of firearms in his home, the defendant disclosed a pair of compound bows, a pistol, and a decorative short sword, but made no reference at all to the rest of the arsenal the officers observed when they executed a search warrant at his home on December 22, 2020.  During the first day of the detention hearing, defense counsel explained that the defendant focused on the question asked and answered it honestly, as he was then aware that the guns identified during the search were known to law enforcement and had since been removed from the house.  A candid response to the probation officer's inquiry, however, would have included a statement regarding all of the weapons and what had happened to them, to the extent Winegar knew of their fate.[4]

The next circumstance regarding defendant's tendency to shade the truth or keep his cards close to his chest relates to his failure to disclose the prospective sale of his home until the court inquired about his trip to Brazil at the end of the first day of the detention hearing.  At that point, he disclosed

---

[4] The court notes that Ms. Winegar was also less than fully transparent regarding the firearms with probation.

the existence of a signed purchase and sales agreement for his
current residence.  The lack of openness about his house being
on the market or under contract was particularly striking
because the defendant had proposed that he reside at his home if
he were released pending trial.[5]

The next circumstance raising a concern for the court
relates to the evolving narrative as to whether his trip to
Brazil was open-ended.  In response to the government's proffer
that defendant's wife had told the officers executing the search
warrant that she did not know when he planned to return from
Brazil and showed them a credit card record for the ticket
purchase, the defendant initially represented on the first day
of the detention hearing that he had planned to return the
United States on December 28, 2020, but that the issuance of an
arrest warrant had altered that plan.[6]  Then, on the second day
of his hearing, he proffered that he had an email demonstrating
that he had booked a return flight for January 18, 2021.

In addition, the defendant's explanations for his trip to
Brazil have shifted over time.  The defendant's wife told law

---

[5] On the first day of the detention hearing, the defendant
alternatively proposed to reside at his parents' home upon
release.  This plan was not repeated on the second day and
appears to have been withdrawn.

[6] The arrest warrant was issued on December 21, 2020.

enforcement agents that he had "received some money" and went to Brazil to look at "investment properties." His counsel explained to the court during the first day of his detention hearing that his family had a previous "interest in real estate in Brazil" and had a "potential plan" to "potentially use the funds from the sale of [their home] to relocate to Brazil." During the second day of the two-day hearing, defense counsel clarified that Winegar and his wife were interested in moving to Brazil, anticipating that the proceeds from the home sale would provide the requisite funding.

The final indicator suggesting a lack of transparency and trustworthiness concerns a discrepancy between the defendant's reporting to pretrial services that he had no history of mental health issues and the government's proffer that the defendant had told a law enforcement officer in 2017 that he had been diagnosed with PTSD and had been in treatment since 2012. The defendant has explained to this court that he had made the remark to an officer informally, that he has never been diagnosed with PTSD, and that he has only had one counseling session in his life. The court is concerned, however, that the defendant either reported inaccurate or misleading information to the law enforcement officer in 2017, or to this court. Either way, the discrepancy is troubling.

The court need not make a finding regarding where the truth lies with respect to any of these incidents.  It is enough for the court to note that there are several discrepancies and that the defendant's narrative shifts, unravels, and reforms over time.  The pattern appears to go beyond mere factual mistakes or memory lapses.  Whether calculated, impulsive, or ingrained, defendant's lack of transparency and tendency to shade the truth in his communications with the court and pretrial services is a factor weighing heavily in favor of detention.

### 4.   Nature and seriousness of danger posed by release

The danger posed by Winegar's release is significant.  His threats promise retribution for the failure of Members of Congress to support certain ends.  The seriousness of the danger posed is amplified when considered in the context of the weapons amassed at his home.  Weighing all of the relevant factors, the court concludes that the government has demonstrated by clear and convincing evidence that defendant poses a danger to the community if released.

### B.   **Risk of Flight**

The government has also met its burden of showing by a preponderance of the evidence that Winegar is a flight risk, in light of the § 3142(g) factors.  His demonstrated willingness to withhold information supports the court's flight risk analysis.

Defendant has not held a job outside of the home since he was honorably discharged from the Navy and then completed a college degree program in 2015-2016.  He reports that he takes care of his young children while his wife works; he privately tutors students in languages; and he is the landlord and property manager of two rental properties in Manchester.  The court appreciates that taking care of very young children can be a full-time job.  There is no information before the court, however, suggesting that defendant's tutoring and duties as a landlord require any substantial time commitment.  And the fact that defendant's childcare responsibilities are not the type of employment that can be confirmed by pretrial services through phone calls to supervisors or co-workers is a factor that favors detention.

The defendant's conduct after receiving notice that authorities were investigating him bears on risk of flight.  On December 21, 2020, the day after the U.S. Capitol Police came to his house to speak with him, the defendant flew to Brazil, where he remained for several weeks (through the Christmas holiday). Defendant is fluent in several languages, including Portuguese, and defense counsel proffered, at the detention hearing, that the defendant and his wife had considered moving to Brazil.  On January 11, 2021, Winegar voluntarily surrendered to authorities

upon his arrival at Logan Airport.  A defendant's self-surrender, to the extent it manifests "an early decision to not flee," can be a factor favoring release.  United States v. Pon, No. 3:14-cr-75-J-39PDB, 2014 WL 3340584, at *5, 2014 U.S. Dist. LEXIS 95049, at *16 (M.D. Fla. May 29, 2014).  In this case, however, the defendant's self-surrender followed an abrupt trip to Brazil that he has not adequately explained.  The temporal proximity between the visit by U.S. Capitol Police on December 20 and Winegar's departure on December 21, coupled with the fluid narrative regarding the reasons for the trip to Brazil and sources of funding he planned to use to purchase property there, diminishes the weight the self-surrender factor might otherwise bear in the court's assessment of risk of flight.

Moreover, the defendant's trip to Brazil in late December 2020 demonstrates that he has the ability to purchase a ticket and travel abroad on short notice (during a pandemic), as well as the ability to muster the resources and family buy-in to stay away from his wife and young children for an extended period of time.  Those factors favor a finding that defendant is a flight risk.  United States v. Gadson, No. 3:14-CR-094 JD, 2015 WL 163553, at *3, 2015 U.S. Dist. LEXIS 3407, at *9 (N.D. Ind. Jan. 12, 2015) (ordering detention upon information including that defendant had "shown an ability to quickly (and recently) access

significant funds for himself, even if by way of credit, which
could be utilized to abscond, and has shown his adeptness at
international travel and ability to book last minute flights to
locations not only outside of this district, but outside of the
country").

The charged offense at issue is punishable by a maximum
sentence of ten years in prison.  Defense counsel has argued,
however, that defendant's lack of any criminal history and other
factors could yield a sentencing range of 10 to 16 months under
the Sentencing Guidelines upon a plea of guilty.  This
relatively low sentencing range reduces the incentive to flee,
making this factor neutral in the court's detention analysis.
But the factors that favor release, including his personal ties
to the district, property ownership, status as a landlord, and
role as caregiver of his young children, are outweighed by his
stated willingness to sever his ties to the state, uproot his
family, and move with them to Brazil - a plan he took concrete
steps to put into motion as long ago as March 2019, when he
acquired a visa, and as recently as December 2020, when he
travelled to Brazil to look at properties to buy, and in January
2021, when he signed a purchase and sales agreement on his home
(which has since fallen through).  Considering the relevant
factors, the court finds that the government has met its burden

to show by a preponderance of the evidence that the defendant is
a risk of flight.

### C.   <u>Conditions of release</u>

The court must determine whether there are any conditions
or a combination of conditions that would assure the safety of
the community and the defendant's appearance.  Defendant has
proposed staying in his family home with his wife as his third-
party custodian, and he reports that they have taken their house
off the market.  He further proposes putting all three of his
properties up as security for an appearance bond, tendering his
and his wife's passports, and subjecting himself to location
monitoring and any other restrictions the court may impose,
including a curfew and undergoing a mental health evaluation.

It appears that the defendant's proposal is intended to
address the court's concerns about risk of flight and the
possibility that untreated mental health problems could be
contributing to his behavior, but the court still has serious
doubts about releasing the defendant to his family home, with
his wife serving as third-party custodian.  The defendant was
residing in that home, with his wife and children, when he
allegedly made the phone calls on which the charge is based.
Thus, either Ms. Winegar was aware of the calls and unable to
prevent them, or she was unaware that they were being made.  In

either case, the circumstances do not support her ability to
supervise Winegar and ensure his compliance with conditions.
Relatedly, Ms. Winegar initially represented to law enforcement
that she did not know when defendant would return from Brazil.
At the detention hearing, however, the defendant represented
that he had purchased or planned to buy a return ticket.  Thus,
Ms. Winegar either knew her husband's actual plans for his trip
to Brazil or he was able to keep that information from her.
Either way, the facts show that Ms. Winegar is not an adequate
third-party custodian.  Moreover, Ms. Winegar works full-time
outside the home while defendant is at home with his children.
Presumably, this means there would be long stretches of time
during which there would be no other adult in the house to
monitor his activities.  Based on these circumstances, the court
cannot find that Ms. Winegar is a suitable third-party
custodian.

The defendant has also proposed surrendering his and his
wife's passports and posting an appearance bond secured by his
three properties.  Tendering passports would reduce the risk of
international travel, and the secured appearance bond he
proposes would take away his ability to use a property sale to
finance flight and resettlement, and potentially disrupt the
financial stability of his young family.  But neither the

forfeiture of passports nor the financial risk associated with an appearance bond addresses the court's concerns about dangerousness.  Tortora, 922 F.2d at 886 n.8 ("Real estate as security seems a much more effective condition of release in a 'flight risk' case than in a 'dangerousness' case.").

The defendant has also proposed electronic monitoring as a condition.  Electronic monitoring generally requires access to a phone.  Particularly given the fact that the charged offense is based on threatening phone calls made by the defendant using his wife's cell phone, and an absence of assurance that defendant would not resume making similar threats, the inability to fashion a condition to limit defendant's access to a phone is a significant concern for the court.  Thus, practical conditions of release cannot be fashioned to address this aspect of dangerousness.  Capriotti, 2021 WL 229660, at *4, 2021 U.S. Dist. LEXIS 12223, at *14 (absent "reasonable assurance that the threats themselves will stop upon release," court declined to issue release order).

Furthermore, electronic monitoring is "less effective in 'dangerousness' cases than in 'flight risk' cases." United States v. Martinez-Torres, 181 F.3d 81, 1998 WL 1085669, at *2, 1998 U.S. App. LEXIS 23293, at *6 (1st Cir. 1998) (unpublished table decision) (citation omitted).  While location monitoring

will alert probation if the defendant were to leave his home, it "provides little useful information about what [a defendant] is doing." United States v. Martin, 447 F. Supp. 3d 399, 403 (D. Md. 2020).  In this case, dangerousness is at issue, and location monitoring fails to assuage the court's concerns.  The court's concern in this regard is compounded by its finding that defendant has not been transparent in his dealings with the court and probation.

### Conclusion

For these reasons, the court finds that the government met its burden of proving by clear and convincing evidence that there are no conditions or combination of conditions of release that will reasonably assure the safety of the community. Accordingly, it is **ORDERED** that the defendant be detained pending trial.

The defendant is committed to the custody of the Attorney General or his designated representative for confinement in a correctional facility, to be held separately, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the government, the person in charge of the

correctional facility shall deliver the defendant to the United
States Marshal for the purpose of appearing in connection with
court proceedings.

          SO ORDERED.

                              _____
                              Andrea K. Johnstone
                              United States Magistrate Judge

Date:  February 4, 2021

cc:    Charles J. Keefe, Esq.
       Charles L. Rombeau, Esq.
       U.S. Probation
       U.S. Marshal